UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

S<span style="font-variant:small-caps">arah</span> M<span style="font-variant:small-caps">orris</span>,

    Plaintiff,

v.

TRBR, I<span style="font-variant:small-caps">nc.</span> d/b/a S<span style="font-variant:small-caps">uperior</span> B<span style="font-variant:small-caps">uick</span> GMC,

    Defendant.

_____/

Case No. 18-12252

S<span style="font-variant:small-caps">enior</span> U.S. D<span style="font-variant:small-caps">istrict</span> J<span style="font-variant:small-caps">udge</span>
A<span style="font-variant:small-caps">rthur</span> J. T<span style="font-variant:small-caps">arnow</span>

U.S. M<span style="font-variant:small-caps">agistrate</span> J<span style="font-variant:small-caps">udge</span>
D<span style="font-variant:small-caps">avid</span> R. G<span style="font-variant:small-caps">rand</span>

**O<span style="font-variant:small-caps">rder</span> G<span style="font-variant:small-caps">ranting</span> D<span style="font-variant:small-caps">efendant's</span> M<span style="font-variant:small-caps">otion</span> <span style="font-variant:small-caps">for</span> S<span style="font-variant:small-caps">ummary</span> J<span style="font-variant:small-caps">udgment</span> [12]**

Plaintiff, Sarah Morris, brings this retaliation and discrimination action against her former employer, TRBR, Inc., *doing business as* Superior GMC ("Superior" or "Superior GMC"). Plaintiff started working at Superior GMC in June 2016 as a Title Clerk before she was fired one year later. Plaintiff claims that she was subject to heightened scrutiny and ultimately fired, because she refused to engage in Defendant's illegal car registration practices; complained to her supervisor about a co-worker who was harassing her; and began dating the Chaldean owners' nephew, and Plaintiff's current husband, against their wishes. Plaintiff alleges violations of the Whistleblower Protection Act, Public Policy, and Title VII. Due to

the statute of limitations, Plaintiff agrees to the dismissal of her Elliot-Larsen Civil Rights Act ("ELCRA") claims. (ECF No. 14, PageID. 317).

Before the Court is Defendant's Motion for Summary Judgment [12], filed on May 31, 2019. On July 2, 2019, Plaintiff filed a Response [14]. On July 26, 2019, Defendant filed a Reply [15]. For the reasons explained below, the Court **GRANTS** Defendant's motion.

## FACTUAL BACKGROUND

**A. Superior GMC hires Plaintiff**

Defendant Superior GMC is a car dealership located in Dearborn, Michigan. It is owned and operated by a Chaldean married couple, Bas and Tanya Robin. (ECF No. 14-12, PageID. 485). Defendant hired Plaintiff as a Title Clerk in June 2016. (ECF No. 14-3, PageID. 417). Title Clerks process titles for vehicles after they have been purchased. (ECF No. 14-3, PageID. 424). On her job application Plaintiff was asked if she had ever been convicted of a crime. (ECF No. 12-2, PageID. 202). She marked "no." (*Id.*). However, when asked the same question during a deposition for this lawsuit, Plaintiff claimed that in 2005 she had been convicted of driving while intoxicated. (ECF No. 12-3, PageID. 216).

### B. Titling Issues

Plaintiff's main job was to process vehicle titles. However, the vehicle title process at Superior GMC was suspicious to Plaintiff. Instead of waiting for insurance information and car registration documents before processing titles, Plaintiff alleges that Defendant told her to forge customers' signatures and process titles with only a license plate photo. (ECF No. 14-3, PageID. 423). Plaintiff claims that she confirmed her suspicions of this practice when she called the State of Michigan. During the call, Plaintiff asked if she could "use a picture of a license plate to register a vehicle?" (ECF No. 14-3, PageID. 443). She claims the representative answered, "[n]o, absolutely under no condition. It has to be a valid registration." (*Id.*). Afterwards, Plaintiff informed one of the owners, Tanya Robin, of the conversation. (ECF No. 14-10, PageID. 481). Defendant's title practices, however, did not change and Plaintiff continued to resist them. (ECF No. 14-3, PageID. 425). As a consequence, Plaintiff claims that her work piled up and the titles did not get processed as fast as her supervisor, Barbara LaLonde, wanted. (ECF No. 14-3, PageID. 423, 426). Plaintiff also alleges that as a result of her resistance she was subject to heightened scrutiny. (ECF No. 14-3, PageID. 425). For example, she was accused of being distracted at work, using her cellphone during her shift, and

allowing unauthorized individuals in the cashier's area, which she was formally reprimanded for. (*Id.*; ECF No. 14-3, PageID. 425-26).

**C. Plaintiff's Harassment Complaint**

Plaintiff claims that a co-worker, Alan Kincaid, harassed her while at work. She claims that, at first, she and Kincaid were friends and would occasionally have lunch together. (ECF No. 12-3, PageID. 223, 227). But once she rebuffed his romantic advances, Plaintiff claims that Kincaid took "every opportunity he had to make [her] uncomfortable." (*Id.* at 221-22). He began to harass her by coming into the cashier's office, where she occasionally worked, unauthorized to ask why she would not talk to him, "touch things on [her] desk" and "linger" (*Id.*). She claims that he additionally kept close tabs on her Facebook activity and made comments about her posts. (*Id.* at 223).

Kincaid's harassment was evident to other employees. Plaintiff's friend and co-worker, Tiffiny Holladay, observed that Kincaid "was going out of his way to try to just be irritating . . . [and] make [Plaintiff] uncomfortable." (ECF No. 12-7, PageID. 253). Plaintiff's co-worker and now husband also observed several instances of Kincaid's harassment and even instances of Kincaid following Plaintiff around the showroom (ECF No. 14-2, PageID. 400-01). In April 2017, Plaintiff made a complaint about Kincaid's behavior to her supervisor, Barbara LaLonde, and

requested a meeting. (ECF No. 14-3, PageID. 448). Plaintiff claims that LaLonde was annoyed by her complaint during their meeting and did not properly address her concerns. (*Id.*). After the meeting, both Kincaid and Plaintiff received an email about how to behave professionally with one another. (ECF No. 12-20, PageID. 300; ECF No. 12-15, PageID. 285). A few days later, Plaintiff received a write-up for allowing unauthorized people into the cashier's office. (ECF No. 14-3, PageID. 427). Generally, only managers and authorized cashier office personnel were allowed inside the cashier office. (*Id.*). Plaintiff alleges that the write-up and her subsequent termination were retaliation for her complaint against Kincaid. (ECF No. 12-3, PageID. 236). Defendant denies this and claims that Plaintiff was treated no differently than any other employee in the same position. For example, Defendant points to the fact that Holladay was also disciplined and subsequently terminated for allowing unauthorized employees into the cashier's office. (ECF No. 12-18, PageID. 294).

**D. Dating the Owners' Nephew**

In April of 2017, Plaintiff began dating her co-worker and current husband, Ricardo Harmis[1]. Harmis is the nephew of Superior's owners, the Robins. (ECF No.

---

[1] Following his termination, Ricardo Harmis also sued Defendant in a separate lawsuit for Family Medical Leave Act violations *inter alia*. On March 5, 2020, Defendant won on summary judgment. *Harmis v. TRBR, Inc.*, No. 2:18-CV-11448, 2020 WL 1066096 (E.D. Mich. Mar. 5, 2020). On

14-2, PageID. 344). Plaintiff alleges that the Robins discouraged Harmis from dating Plaintiff, because she is not Chaldean. Harmis testified to the following at his deposition:

> [Bas Robin] had asked me why I was smoking cigarettes with Sarah and that he didn't want any problems with me talking to co-workers and that I need to stay away from her because he said like bad things like she was trash and she's a white girl and you can't do that, don't embarrass me, she has kids, and I had just said that we're just co-workers, we're just smoking cigarettes.

(ECF No. 14-2, PageID. 392).

In contrast, Bas Robin claims that he did not have any opinions about whether Harmis should only date Chaldean women. (ECF No. 12-9, PageID. 266). In fact, both Bas and Tanya Robin claim that they did not know Plaintiff and Harmis were dating. (*Id.*; ECF No. 12-10, PageID. 268). Bas Robin even believed that Harmis was dating another girl named Fabiola. (ECF No. 12-9, PageID. 266). Plaintiff herself corroborates that at the time of her termination, "everybody thought that [Harmis] was dating a different girl." (ECF No. 12-3, PageID. 241). Harmis also states that he did not know if Bas Robin knew he and Plaintiff were dating, and only "assum[ed] that [Tanya Robin] knew through her sister." (ECF No. 14-2, PageID.

---

April 13, 2020, Harmis appealed. Notice of Appeal by Ricardo Harmis (ECF No. 38), *Harmis v. TRBR, Inc.*, No. 2:18-CV-11448 (E.D. Mich. Mar. 5, 2020).

392). Moreover, Harmis does not remember if he told Plaintiff about the alleged comments before she was fired. (*Id.* at 393).

**E. Plaintiff's Termination**

Plaintiff was filling in for the receptionist and answering calls from customers during the week leading up to her termination. While doing so, Defendant alleges that several employees saw that was Plaintiff "rude" toward customers on the phone. (ECF No. 12-12, PageID. 275; ECF No. 15-11, PageID. 825-833). They claimed to have heard her yelling at customers when she could not understand them and repeatedly hang up the phone instead of transferring them to the right department. (*Id.*) Some employees even complained to Tanya Robin. (ECF No. 15-11, PageID. 830-832). Moreover, Tanya Robin herself claims to have witnessed Plaintiff exhibit this behavior "a handful of times" and reprimanded her. (*Id.* at 140-41). On the day she was fired, Bas Robin claims that he received several complaints from customers about Plaintiff's behavior. (ECF No. 12-10, PageID. 269). Bas Robin testified to the following: "I had numerous people come up to me and said, listen, I'm not going to come to the dealership no more because of that person. She's yelling and screaming, saying all kind of stuff to them, hanging up on them." (*Id.*). He subsequently told Barbara LaLonde to fire her. (*Id.* at 270). LaLonde promptly did so and told Plaintiff that she did not like her attitude. (ECF No. 14-13, PageID. 488; ECF No. 14-3,

PageID. 430). Plaintiff denies all of these allegations and claims she was never rude to customers. Holladay similarly claims that Plaintiff was not rude to customers, although she "observed her to be short at times" and "to the point" with customers who were not easy to talk to. (ECF No. 12-7, PageID. 255).

## PROCEDURAL HISTORY

On September 14, 2017, Plaintiff filed this suit in Wayne County Circuit Court alleging Whistleblower Protection Act and Public Policy violations. On June 15, 2018, Plaintiff filed an Amended Complaint to include ELCRA claims for gender and racial discrimination. Plaintiff filed a charge against Defendant with the EEOC and received a Right to Sue Letter on her Ttile VII claims. On July 12, 2018, Plaintiff filed a Second Amended Complaint to include Title VII gender and racial discrimination claims. Plaintiff filed a charge against Defendant with the EEOC and brought her Title VII claims after receiving a Right to Sue Letter. On July 18, 2019, Defendant removed this action to federal court. Defendant filed its Motion for Summary Judgment [12] on May 31, 2019. On July 2, 2019, Plaintiff filed a Response [14]. Defendant filed a Reply [15] on July 26, 2019.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Additionally, the Court views all of the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 255.

## ANALYSIS

### I. Employment Fraud

The threshold issue of this case is whether or not Plaintiff's claims are barred by her fraudulent job application. They are not. Neither party disputes that although Plaintiff was convicted of driving while intoxicated in 2005, she claimed that she had not been convicted of a crime on her job application in 2016. (ECF No. 12-2; ECF No. 12-3, PageID. 216).

Defendant argues, with outdated case law, that resumé fraud discovered after discharge is grounds for summary judgment against Plaintiff. However, the Supreme Court overruled this view in *McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352 (1995). The Court "question[ed] the legal conclusion reached by those courts that after-acquired evidence of wrongdoing which would have resulted in discharge bars employees from any relief under the ADEA" and held "[t]hat ruling is incorrect." *Id.* Therefore, Plaintiff's claims are not barred.

## II. Whistleblower Protection Act and Public Policy Claims

### a. Whistleblower Protection Act

The Whistleblower Protection Act ("WPA") prohibits employers from discharging, threatening or otherwise discriminating against an employee who "reports or is about to report . . . a violation or a suspected violation of a law." MICH. COMP. LAWS § 15.362. Under the WPA, courts analyze retaliation claims under the *McDonnell Douglas Corp.* burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *see also Whitaker v. U.S. Sec. Assocs., Inc.*, 774 F. Supp. 2d 860, 867 (E.D. Mich. 2011). This framework contains three steps. First, Plaintiff must establish a *prima facie* case of retaliation. *Whitaker*, 774 F. Supp. 2d at 867 (citing *Taylor v. Modern Engineering, Inc.,* 252 Mich. App. 655, 659 (2002)). Second, the burden shifts to Defendant to articulate "a legitimate, non-

retaliatory reason for taking adverse action against Plaintiff." *Id*. Third, "if Defendant meets this burden of production, Plaintiff then has the opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for taking retaliatory action against her." *Id*.

To establish a prima facie WPA violation "a plaintiff must show that (1) [she] was engaged in a protected activity as defined by the WPA, (2) [she] was discharged, and (3) a causal connection existed between the protected activity and the discharge." *Chandler v. Dowell Schlumberger, Inc.,* 456 Mich. 395, 399 (1998). Defendant argues that there is no genuine issue of material fact as to the first and third elements: Plaintiff's protected activity and its causal connection to her discharge. The Court agrees.

The protected activity element is fulfilled by "(1) reporting to a public body a violation of a law, regulation, or rule, (2) being about to report such a violation to a public body, or (3) being asked by a public body to participate in an investigation." *Chandler*, 456 Mich. At 399 (citing MICH. COMP. LAWS. § 15.362). Here, Plaintiff has not engaged in any of these actions. In her own deposition, she states that she neither reported nor threatened to report Defendant's practices to the State of Michigan. (ECF No. 12-3, PageID. 219-20). Instead, she claims that she merely asked the representative she usually speaks to whether she was allowed to register

cars with only a picture of a license plate. The representative told her "no" and that a valid registration was needed. (ECF No. 14-3, PageID. 443). Plaintiff later texted this information to Tanya Robin who responded with an "ok." (ECF No. 14-10, PageID. 481).

The parties dispute whether or not this phone call qualifies as a protected activity under the WPA. The Court finds that it is not. In analyzing whether questions to public bodies can be reports of a suspected violation, courts look to the totality of the circumstances to determine whether the meaning and intent behind a plaintiff's question was to report a violation. For example, in *Whitaker v. U.S. Sec. Assocs., Inc.*, the court found that a Transportation Security Agency ("TSA") Agent's questions to the TSA about DTW Airport's vehicle checkpoint security regulations were a report under the WPA. *Whitaker v. U.S. Sec. Assocs., Inc.* 774 F. Supp. 2d 860, 867-69 (E.D. Mich. 2011). The Court reasoned that the plaintiff's questions were not "merely seeking information or posing vague questions," but instead opened a dialogue about plaintiff's security concerns, which the TSA believed warranted further investigation. *Id*.

Here, the State of Michigan never opened an investigation or made any further inquiries into Plaintiff's question. And significantly, Plaintiff herself did not perceive her own question as a report. Either way, this claim fails, because

Defendant's have proven non-retaliatory reasons for firing Plaintiff, as the Court will discuss further in a later section.

    b. <u>Public Policy claim</u>

Plaintiff's *prima facie* case holds more water for her Public Policy claim. Michigan law recognizes a public policy exception to at-will employment. *Landin v. Healthsource Saginaw, Inc.,* 305 Mich. App. 519, 523 (2014). This exception is "based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Suchodolski v. Mich. Consol. Gas Co.,* 412 Mich. 692, 695 (1982). Actionable termination includes discharging an employee for refusing to violate a law in the course of employment, such as "refusal to falsify pollution reports; refusal to give false testimony before a legislative committee; [and] refusal to participate in a price-fixing scheme." *Landin*, 305 Mich. App. at 524.

To establish a public policy exception, Plaintiff does not have to prove that she made a report, she only has to prove that her employer asked her to violate the law and she refused. Plaintiff has proven this by showing that she refused to register cars without proper legal documents such as insurance and registration. This allegedly irked her supervisor, Barbara LaLonde, in particular, who Plaintiff claims often threw paper on Plaintiff's desk and yelled at her for not processing titles fast

enough. (ECF No. 12-3, PageID. 231-32). However, Plaintiff's WPA and Public Policy claims fail for the same reason — she cannot show a genuine dispute of fact for why she was fired — and therefore, both claims fail for want of a causal connection between her protected activity and her termination.

      c. <u>Non-retaliatory Basis for Termination</u>

Defendant claims that Plaintiff was fired, because she was rude to customers over the phone. They have depositions from Tanya Robin, Bas Robin, and Pamela Abbo to support this claim. Plaintiff, on the other hand, relies only on her own testimony and the testimony of her best friend, Tiffiny Holladay. Tanya Robin and Pamela Abbo claim they observed Plaintiff being rude to customers on the phone. (ECF No. 12-12, PageID. 275; ECF No. 15-11, PageID. 825-833). Tanya Robin even claims that she reprimanded Plaintiff several times and names six other members of the sales team who witnessed the same behavior. In her defense, Plaintiff simply denies being rude by pointing to the testimony of her best friend, Tiffiny Holladay. Holladay does not do as many favors for Plaintiff as she perceives. Although Holladay explicitly denies that Plaintiff is rude, she implicitly confirms it by stating that Plaintiff is short with people and not "afraid to speak her mind." (ECF No. 12-7, PageID. 250). Furthermore, Holladay only speaks in general terms about Plaintiff's demeanor and does not allege to have witnessed Plaintiff's interactions

with customers the week she was fired. (ECF No. 12-7, PageID. 254-55). The testimony of Tiffiny Holladay is not sufficient to create a question of fact. Therefore, Plaintiff's WPA and Public Policy claims are dismissed.

### III. Title VII: Racial Discrimination

Plaintiff claims that Defendant's owners, a Chaldean couple, disapproved of her relationship with their nephew, Ricardo Harmis, and fired her, because of it. Defendant claims that the owners never knew Plaintiff and Harmis were dating and even if they did, they had non-discriminatory reasons for her discharge.

Although Plaintiff is white, Title VII also protects members of a non-protected class who are "victims of discriminatory animus toward [protected] third persons with whom the individuals associate." *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999) (holding that a white parent stated a viable Title VII claim when his employer fired him, because his daughter was bi-racial); *see also Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) ("'Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against, because of *his* race.'") (quoting *Troy v. Suburban Mgmt. Corp.*, 908 F.2d 974 (6th Cir. 1990) (emphasis in original)).

To prove intentional discrimination using indirect or circumstantial evidence, Plaintiff must use the burden-shifting framework established in *McDonnell Douglas Corp*. *See supra* Part II a. To establish a *prima facie* case, Plaintiff must show that "(1) she is a member of a protected class; (2) she was terminated; (3) she was qualified for the position; and (4) she was replaced by a person outside of a protected class or, alternatively, was treated differently than a similarly situated, non-protected employee." *Hughes v. Henry Ford Health Sys*., No. 17-10436, 2018 WL 3956362, at *7 (E.D. Mich. Aug. 17, 2018) (citing *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007)).

Because there is little evidence to show that Plaintiff was treated differently due to her relationship with Harmis, her *prima facie* case here is tenuous. She does not allege that the owners mentioned her relationship with Harmis to her or expressed disapproval. She does allege that a co-worker asked her where Harmis was living. But there is no indication from her evidence that any of the alleged heightened scrutiny she received was in anyway connected to her relationship with Harmis. Although Harmis alleges that the owners often made critical comments and questioned his association with Plaintiff, Harmis did not tell the owners that he and Plaintiff were dating. He merely *assumes* that Tanya Robin was aware of their relationship. (ECF No. 14-2, PageID. 392). Additionally, it is unclear whether

Plaintiff was aware of the comments the Robins allegedly made to Harmis until after she was terminated. Bas Robin himself states that he did not know Harmis was dating Plaintiff and thought he was dating a different girl named Fabiola. But looking at the evidence in the light most favorable to the nonmoving party, there may be a genuine dispute as to whether she was discriminated against for her relationship with Harmis, romantic or otherwise.

However, once again, this claim fails for the same reason this entire suit fails, Plaintiff cannot show that a reasonable jury could believe that her firing for being rude to customers was pretextual. In addition, there is no evidence of disparate treatment between herself and similarly situated co-workers, there is no evidence of a cover-up, and there is no evidence that being consistently rude to customers in a consumer facing business to the extent that warranted multiple complaints would be an insufficient reason for termination. *See Igwe v. Salvation Army*, 790 F. App'x 28, 34–35 (6th Cir. 2019); *see also McClain v. NorthWest Community Corrections Center Judicial Corrections Bd.*, 440 F.3d 320 (6th Cir. 2020). Therefore, this claim is dismissed.

### IV. Title VII: Gender Discrimination

Plaintiff claims that Defendant retaliated against her for complaining about Alan Kincaid's harassment. Her Title VII retaliation claim follows a similar pattern.

Like Title VII discrimination claims, Title VII retaliation claims may be proved with direct or indirect evidence via the *McDonnell Douglas* framework. *See supra* Part II a**.** Under this approach, Plaintiff must establish a *prima facie* case of retaliation by proving that "(1) [she] engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Jones v. Johanns*, 264 F. App'x. 463, 466 (6th Cir. 2007)).

Neither party seems to dispute that Kincaid harassed Plaintiff and that Plaintiff complained about the harassment to her supervisor, Barbara LaLonde. But from here their stories diverge. Defendants claim LaLonde met with Plaintiff, listened to her concerns and sent both Plaintiff and Kincaid an email about how to interact with one another in a professional manner. Plaintiff claims that LaLonde "victim blamed" her in their meeting, chastised her for having a personal relationship with Kincaid, and did not properly reprimand him. (ECF No. 14-3, PageID. 448-50).

Taking plaintiff's story as true, the Court's inquiry shifts to whether Plaintiff's complaint caused her write-up and ultimately her termination. A few days after Plaintiff's meeting with LaLonde about Kincaid, Plaintiff received a write-up for

allowing unauthorized people in the cashier's office. Plaintiff believes this write-up was retaliatory, because the violation was likely in reference to Kincaid barging into the cashier's office to harass Plaintiff. However, neither the write up nor any other witness corroborates this. It based merely on speculation. Furthermore, Plaintiff was not singled out, both her and several other employees received emails about the cashier office rules. (ECF No. 12-16, PageID. 287; ECF No. 12-17, PageID. 289-91). Moreover, Holladay was also written up for violating the same rule just a few months later and was fired because of it. (ECF No. 12-18, PageID. 294). Once again, this claim fails at the causation stage, because Plaintiff cannot show that her termination was connected to the complaint or otherwise pretextual. This claim is dismissed.

## CONCLUSION

Plaintiff's suit fails because she cannot show that a reasonable jury would believe that her firing for being rude to customers was pretextual. It is important to note that all of Plaintiff's alleged issues at work happened over the course of a year. Defendant could have fired her after she refused to title cars without the proper legal documents. Defendant could have fired her after she complained about harassment. Defendant could have fired her after they suspected she was dating Ricardo Harmis. But they did not — they only fired her after a week of complaints about her

interactions with customers. Interactions that Plaintiff has failed to genuinely dispute. This shows an intervening event that severs any causal connection Defendant's alleged discrimination and/or retaliation could have had with her firing. Therefore, Defendant is entitled to summary judgment as a matter of law.

For the reasons stated above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [12] is **GRANTED**.

**SO ORDERED**.

Dated: May 13, 2020

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge